# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**RYAN MONTGOMERY,**

    **Plaintiff,**

                                       **Civil Action 2:19-cv-01618**
    **v.**                               **Judge Edmund A. Sargus, Jr.**
                                       **Chief Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Ryan Montgomery, brings this action under 42 U.S.C. § 405(g) seeking a review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental social security income ("SSI"). This matter is before the United States Magistrate Judge for a Report and Recommendation ("R&R") on Plaintiff's Statement of Errors (ECF No. 8), the Commissioner's Memorandum in Opposition to Plaintiff's Statement of Errors (ECF No. 13), Plaintiff's Reply (ECF No. 14), and the administrative record (ECF No. 7). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and that the Commissioner's decision be **AFFIRMED**.

## I.    BACKGROUND

Plaintiff applied for DIB and SSI on March 26, 2014, alleging that he became disabled on September 1, 1997. (R. at 240.) After Plaintiff's applications were denied, Administrative Law Judge Noceeba Southern ("ALJ") held a *de novo* hearing and issued a determination that Plaintiff was not disabled within the meaning of the Social Security Act from September 1, 1997, through January 4, 2017. (R. at 40–52.) On November 16, 2017, the Appeals Council denied Plaintiff's

request for review and adopted the ALJ's determination as the Commissioner's final decision. (R. 1–6.)  Plaintiff appealed the Commissioner's final decision to this Court, but the parties jointly moved the Court to remand the matter.  *Montgomery v. Comm'r of Social Security*, 2:17–cv–01079, (ECF Nos. 11, 12.)  Upon remand, the ALJ held a second hearing, at which Vocational Expert John Finch ("VE") testified.  (R. at 1412–1435.)  On February 20, 2019, the ALJ issued a second determination concluding again that Plaintiff was not disabled from September 1, 1997, through the date of that determination.  (R. at 1383–1399.)  Plaintiff timely commenced this action seeking a review of that second determination.

## II.    THE RELEVANT MEDICAL RECORDS

### A.  Medical Opinions From Treating Physician, Robert M. Carr, M.D., Regarding Plaintiff's Physical and Mental RFC[1]

On July 30, 2015, Plaintiff's treating physician, Robert M. Carr, M.D., completed a "Impairment Questionnaire."  (R. at 1078–80.)  Dr. Carr wrote that Plaintiff suffered from "Chrohn disease, irritable bowel syndrome, bile salt diarrhea, migraine, sleep disturbance, prostate/BPH, depression/social anxiety" and that he had probable Gulf War Syndrome, night sweats, lightheadedness, and lower back pain.  (*Id*.)  Dr. Carr further wrote that Plaintiff experienced poor memory; sleep disturbance; personality change; mood disturbances; anhedonia; difficulty thinking or concentrating; social withdrawal or isolation; and decreased energy.  (*Id*.)  Dr. Carr opined that Plaintiff could not do even sedentary work; that Plaintiff's Chrohn's disease limited him from working beyond four hours a day or twenty hours in a week; and that Plaintiff's back pain limited him from bending or standing for more than two to three hours.  (*Id*.)  Dr. Carr further opined that Plaintiff's "chrohn's flareup pain and back pain are much more difficult to

---

[1] Dr. Carr's treatment records, as well as relevant records from other providers, are discussed in the analysis section of this R&R.

tolerate in light of depression" and that Plaintiff would be absent from work more than three times a month, and distracted by his gastrointestinal impairments or his psychological symptoms two thirds of the time. (*Id.*) In a follow-up letter dated September 13, 2016, Dr. Carr wrote that Plaintiff's "condition has not significantly improved;" that Plaintiff was "only working 10-15 hours per week and is now diagnosed with leg pain associated with Chrohn disease;" and that Plaintiff was requiring "prednisone at least 2-3 per year for his Chrohn disease flareups [sic]." (R. at 1372.)[2]

### B. Opinions from Other Healthcare Professionals- Plaintiff's Physical RFC

1. Nurse Practitioner, Laura Saylor

Records from the Veterans Administration indicate that on July 29, 2013, Plaintiff was examined by Nurse Practitioner, Laura Saylor. (R. at 919–969.) Plaintiff indicated that he had been diagnosed with IBS and Chrohn's disease in 2008 after he was discharged from the service. (*Id.*) Plaintiff complained that he experienced alternating constipation and diarrhea, abdominal bloating, cramping, and abdominal pain every time he ate. (*Id.*) NP Saylor opined that Plaintiff "would have a hard time maintaining physical or sedentary work at this time" because "frequent exacerbations" of his intestinal conditions "would interfere with consistent job duties." (*Id.*) Plaintiff also indicated that he had been diagnosed with fibromyalgia in 2009, and that since that time, he had experienced exacerbations of that condition "4-5 x week lasting ½ day, moderate in nature," and that during those exacerbations, he experienced "muscle weakness, extreme fatigue, and decreased energy" that were better with rest. (*Id.*) NP Taylor's examination revealed no trigger points for pain except for the outer upper quadrant on the both sides of Plaintiff's

---

[2] Dr. Carr's September 2016, letter bears a handwritten note stating that the "[p]rednisone 2-3 times per year is not accurate, see CVS printout." (R. at 1372.) It is not clear, however, who authored that note.

buttocks. (*Id*.) NP Saylor opined that because of his exacerbations of fatigue and general muscle weakness, Plaintiff "would have a hard time maintaining gainful employment in a physical or sedentary setting to perform consistent job duties." (*Id*.) NP Saylor also wrote that Plaintiff complained that he experienced headaches "3 x a week lasting 1 hour if he takes his medication [Relpax] or lasts 5 hours if he doesn't take meds" and that he experienced migraines less than once every two months. (*Id*.) NP Saylor opined that Plaintiff "could not work during his exacerbations of headaches." (*Id*.) NP Saylor also wrote that Plaintiff reported sleep disturbances and chronic fatigue syndrome. (*Id*.) NP Saylor indicated that her findings were based upon her in-person examination and that she did not review any medical records, laboratory tests, imaging studies, or other diagnostic tests. (*Id*.)

2. Consultative Examiner, Deidre Parsley, D.O.

Deidre Parsley, D.O., performed a consultative examination of Plaintiff in June of 2014. (R. at 796–805.) Dr. Parsley noted that that Plaintiff's chief complaints were Chrohn's disease, migraine headaches, chronic fatigue syndrome, insomnia, and generalized myalgias. (*Id*.) Her physical examination revealed that Plaintiff had a flat abdomen with positive bowel sounds and generalized tenderness, but no hepatosplenomegaly, rebound tenderness, guarding, rigidity, or CVA tenderness. (*Id*.) Plaintiff's neurological examination revealed no focal deficits with the exception of hyperactive bilateral patellar deep tendon reflexes. (*Id*.) Plaintiff's ranges of motion were normal. (*Id*.) Dr. Parsley noted that during the examination, Plaintiff was pleasant and cooperative; alert and oriented to person, place, and time; his intellectual function appeared normal; and his memory for recent and remote medical events was good. (*Id*.) Plaintiff's mood, however, was depressed and his affect seemed restricted. (*Id*.) Dr. Parsley opined that based on her objective findings, Plaintiff's "ability to perform work-related activities such as bending,

stooping, lifting, walking, crawling, squatting, carrying and traveling as well as pushing and pulling heavy objects appears to be at least mild to moderate [sic] impaired." (*Id.*)

### 3. Reviewing Physicians Leslie Green, M.D., and Abraham Mikalov, M.D.

On June 24, 2014, reviewing physician, Leslie Green, M.D., reviewed Plaintiff's file and opined that Plaintiff could perform a full range of medium work. (R. at 101–04.) Upon reconsideration, reviewing physician, Abraham Mikalov, M.D., also opined on November 22, 2014, that Plaintiff could perform a full range of medium work. (R. at 135–40.)

### 4. Jose Ramirez-Figueroa, M.D[3]

VA records indicate that on September 19, 2017, Jose Ramirez-Figueroa, M.D., examined Plaintiff. (R. at 1831–49.) Dr. Ramirez-Figueroa opined that Plaintiff's chronic fatigue syndrome restricted his routine daily activities to 50% to 75% of his pre-illness levels. (*Id.*) Dr. Ramirez-Figueroa further opined that Plaintiff's IBS and chronic fatigue syndrome impacted his ability to work and that Plaintiff was limited to being able to lift/carry 25 pounds; push/pull 50 pounds; walk 100 yards; stand 60 minutes at a time; and that he could bend/twist, kneel/squat, sit, climb, grasp/grip, and reach without any limitations. (*Id.*)

## C. Medical Records and Opinions - Plaintiff's Mental RFC

### 1. Veterans Administration Records

Plaintiff met with a social worker at Veterans Affairs on May 27, 2004, to screen Plaintiff for depression/social anxiety/PTSD. (R. at 972.) The Social worker wrote that she saw "no indication of symptoms of major depression or PTSD." (*Id.*) Plaintiff indicated that he was

---

[3] Although the ALJ noted that it was unclear if Dr. Ramirez-Figueroa was a treating physician or a non-physician practitioner, (R. at 1394), Plaintiff indicates that Dr. Ramirez-Figueroa performed a C&P examination for the VA (Statement of Errors, ECF No. 8, at PAGE ID # 2010).

more concerned about his physical problems and he declined to return for therapy with a mental health clinician. (*Id*.) Nevertheless, he agreed to keep an appointment with a VA psychologist. (*Id*.) The VA psychologist that subsequently met with Plaintiff on June 8, 2004, wrote that during his service, Plaintiff was a pharmacy technician who dispensed medicines, and that Plaintiff was never under attack or involved in combat. (R. at 970–71.) Plaintiff complained of poor concentration, trouble remembering names, dates, and numbers, and experiencing "slight" feelings of anxiety in social situations, although that anxiety had not stopped him from attending events. (*Id*.) The VA psychologist opined that Plaintiff did not have Gulf War syndrome, social phobia, or depression, and although Plaintiff "might be considered to have anxiety disorder," it was questionable if his symptoms were "significant enough to warrant that diagnosis, and that this diagnosis is given provisionally." (*Id*.) The VA psychologist also wrote that Plaintiff's most salient symptoms were "fatigue and muscle weakness (and irritable bowel syndrome)" but Plaintiff's joints did not hurt him "like in fibromyalgia." (*Id*.) He further opined that Plaintiff's problems did not appear to be mental and he recommended that Plaintiff be seen by a specialist to check for "chronic fatigue syndrome vs a muscular wasting disease." (*Id*.)

2. Consultative Examiner, Marc E.W. Miller, Ph.D.

Marc E.W. Miller, Ph.D., consultatively examined Plaintiff in May of 2014. (R. at 791–94.) Plaintiff told Dr. Miller that his chief complaint was that he had Gulf War Syndrome. (*Id*.) Dr. Miller wrote that Plaintiff was cooperative and mannerly and spoke intelligibly. (*Id*.) He was alert and oriented to person, place, time, and situation but "[h]e had a rather blunted affect." (*Id*.) Dr. Miller further wrote that Plaintiff "appears to exhibit anxiety and depression" and he opined that Plaintiff was limited as follows:

> [Plaintiff's] abilities and limitations in regard to understanding, remembering, and carrying out one and two step job instructions indicate no difficulty. He appears to

be of good intelligence. He has worked in the past. He complains of difficulty with his memory. His abilities and limitations in regard to his interaction with co-workers, supervisors, and the public indicate some issues due to his anxiety and depression. He indicates he has no interest in activities anymore. He doesn't care to be around people. He no longer has any friends. [Plaintiff's] abilities and limitations in regard to maintaining attention span and concentration indicate some issues. He finds it difficult to keep his mind on tasks or reading. He indicates he cannot deal with change. He feels this may be a result of his Gulf War Syndrome. His abilities and limitations in regard to dealing with stress and pressure in a work setting indicate difficulty. He rated his coping skills as poor. He indicates he cannot work with the public.

(*Id.*)

3. Reviewing Physicians Carl Tishler, Ph.D. and Courtney Zeune, Psy.D.

On June 24, 2014, reviewing physician Carl Tishler, Ph.D., opined that Plaintiff was moderately limited with regard to his ability to carry out detailed instructions; his ability to maintain attention and concentration for long periods of time; and his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, or to perform at a consistent pace without an unreasonable number and length of rest periods. ((R. at 92–106.) Dr. Tishler opined that Plaintiff was limited to performing "2-3 step tasks in environments with flexible production standards and schedules." (*Id.*) Dr. Tishler noted that Plaintiff "doesn't enjoy being around people but [he] related appropriately to CE" and opined that Plaintiff was moderately limited with regard to his ability to interact appropriately with general public and thus limited to "superficial, infrequent social interactions." (*Id.*) In addition, Dr. Tishler opined that Plaintiff was moderately limited with regard to his ability to respond appropriately to changes in the work setting, and that he was thus limited to performing "static tasks in settings without frequent changes." (*Id.*)

Upon reconsideration, reviewing physician Courtney Zeune, Psy.D., opined that Plaintiff had the same moderate concentration and persistence limitations opined by Dr. Tishler, but that Plaintiff was limited to "simple and some multi-step short cycle work tasks in a setting that does

not require rapid pace or strict productivity quotas." (R. at 126–40.) Dr. Zeune further opined

that Plaintiff was moderately limited with regard to his ability to interact appropriately with

general public and with regard to his ability to accept instructions and respond appropriately to

criticism from supervisors, and that he was thus limited to interacting "with coworkers for

superficial exchanges in a less public setting with a supervisor who provides constructive

feedback rather than criticism." (*Id*.) Dr. Zeune also opined that Plaintiff had moderate

limitations with regard to his ability to respond appropriately to changes in the work setting, and,

like Dr. Tishler, she opined that Plaintiff was thus limited to "performing static tasks in settings

without frequent changes." (*Id*.)

## III.     THE SECOND ADMINISTRATIVE DECISION

In the February 20, 2019, determination, the ALJ found that Plaintiff was not disabled.

At step one[4] of the sequential evaluation process, the ALJ found that Plaintiff had engaged in

substantial activity from 1997 until 2000, and from 2002 until 2013, but had not engaged in

---

[4] Social Security Regulations require an ALJ to resolve a disability claim through a five-step
sequential evaluation of the evidence. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Although
a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d
727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five
questions:
   1. Is the claimant engaged in substantial gainful activity?
   2. Does the claimant suffer from one or more severe impairments?
   3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria
      of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R.
      Subpart P, Appendix 1?
   4. Considering the claimant's residual functional capacity, can the claimant perform his or
      her past relevant work?
   5. Considering the claimant's age, education, past work experience, and residual functional
      capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264
(6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

substantial activity since 2013.  (R. at 1385.)  At step two, the ALJ found that Plaintiff had the following severe physical and mental impairments: Crohn's disease, chronic fatigue syndrome, irritable bowel disorder, migraines, fibromyalgia, and affective and anxiety-related disorders. (R. at 1386.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 1387.)

Before analyzing if Plaintiff was able to perform any of his past work at step four, the ALJ determined that Plaintiff had the following Residual Functional Capacity ("RFC"):

> The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(c) and 416.967(c) except that he will be off task up to 7% of the workday due to fatigue and should be able to lay down, sit down, and/or use the restroom during regularly [sic] breaks.  He will require a work absence one day a month.  He can perform simple routine tasks with no fast pace or strict production quotas.  He can have occasional interaction with others, but no interaction with the general public.  He can perform low stress work defined as entailing only occasional changes and occasional decisionmaking.

(R. at 13905.)

When assessing Plaintiff's physical RFC, the ALJ considered the opinion evidence in the record.  She assigned limited weight to the opinion from consultative examiner Dr. Parsley.  (R. at 1393.)  In so doing, the ALJ noted that Dr. Parsely was not a gastrointestinal specialist; she lacked access to the longitudinal record; and her examination revealed normal findings that were consistent with other examination findings but inconsistent with the postural restrictions that she had opined.  (*Id*.)  The ALJ also assigned limited weight to the opinions from reviewing physicians Drs. Green and Mikalov, both of whom had opined that Plaintiff could perform a full range of medium work.  (*Id*.)  The ALJ noted that both of the reviewing doctors did not have access to the entire medical record, including "hearing level medical exhibits," and that the entire longitudinal record supported "a more restrictive limitation to light exertion with the off task,

work break, and work absence limitations" that the ALJ included in Plaintiff's RFC. (*Id*.) Similarly, the ALJ assigned partial weight to the opinion from Dr. Ramirez-Figueroa. (R. at 1394.) The ALJ found that the longitudinal record supported a more restrictive limitation to light exertion with the off-task limitations that the ALJ included in Plaintiff's RFC. (*Id*.) The ALJ also assigned little weight to the opinions from treating physician, Dr. Carr, and NP Saylor. (R. at 1393–94.)

With regard to Plaintiff's mental RFC, the ALJ assigned significant weight to the opinion from consultative examiner, Dr. Miller because it was generally consistent with the record as a whole. (R. at 1395–96.) The ALJ noted that although Dr. Miller's opinion was not expressed in precise assessments of function-by-function abilities, Dr. Miller's concerns were addressed in the limitations that the ALJ included in Plaintiff's RFC. (R. at 1396.) The ALJ also gave partial weight to the opinions from state agency reviewers Drs. Tishler and Zeune. (*Id*.) The ALJ explained that their opinions were generally consistent with mild findings and conservative treatment for Plaintiff's mental health issues, but the record did not support a need to limit Plaintiff to only superficial interactions with others, occasional interactions with coworkers and supervisors, and no interactions with the general public because Plaintiff had no problems interacting with numerous healthcare providers or when interacting with others when he was engaged in cabin rental operations at his family's business. (*Id*.) In addition, the ALJ explained that the record did not support a need to limit Plaintiff to a work environment free from criticism from supervisors because the record contained no evidence that Plaintiff reacted poorly to constructive feedback. (*Id*.)

At step five of the sequential process, the ALJ relied on the VE's testimony and found that Plaintiff was not capable of performing his past relevant work but that jobs exist in

significant numbers in the national economy for an individual with Plaintiff's age, education, work experience, and RFC. (R. at 1397–98.) Examples included inspector-packer, garment sorter, and mail clerk. (R. at 1398.) The ALJ further found Plaintiff capable of making a successful adjustment to such employment. (R. at 1399.) The ALJ therefore concluded that he was not disabled under the Social Security Act. (*Id.*)

## IV.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . . "). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## V.      ANALYSIS

Plaintiff contends that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to properly evaluate the medical evidence, including that the ALJ specifically failed to properly weigh opinion evidence from Dr. Carr and NP Saylor.  The undersigned concludes that Plaintiff's contentions are without merit.

### A.      The ALJ Did Not Commit Reversible Error When Weighing the Opinion from Treating Physician, Dr. Carr

When assessing the medical evidence the ALJ assigned little weight to Dr. Carr's opinion.  (R. 1393–94.)  The ALJ first summarized Dr. Carr's opinion as follows:

> Dr. Carr opined that [Plaintiff's] back pain prevented bending and standing for more than 2 to 3 hours.  Dr. Carr opined that [Plaintiff] could not do sedentary work and that his Chrohn's disease limited work beyond 4 hours a day . . . Dr. Carr opined that [Plaintiff] would have excessive work absences and would be distracted by his gastrointestinal impairments up to two thirds of the day.

(R. at 1393.)  The ALJ then analyzed and weighed Dr. Carr's opinion.

> !
> In this case, I assign little weight to the opinions of treating physician Dr. Carr, as his suggested limitations to exertional and postural activities, as well as his suggested off task limitations and work absences, are not supported by the above-summarized record, which documents generally substantially unremarkable physical and exam finding, with the claimant routinely found to be in no distress or no acute distress.  The record does not document persistent neurological musculoskeletal deficits, and the claimant's gait and ability to ambulate have been routinely normal.  Moreover, the claimant engaged in significant activities of living including work activity and caring for his children.  Dr. Carr a specialist in family medicine, had an extended treating relationship with the claimant but he is not a specialist in neurology or gastroenterology.  The above summarized record

documents that the claimant's gastrointestinal conditions are generally under relatively good controlled [sic] with the conservative treatment he receives. I further note that Dr. Carr is not a mental health professional and that his indications of mental signs and/or symptoms are inconsistent with the longitudinal record, as summarized below, which documents no professional mental health treatment and generally normal mental status functioning.

!

(R. at 1393–94.)

An ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c). The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . . " 20 C.F.R. § 416.927(d)(2); *Blakley*, 581 F.3d at 408. If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). Nevertheless, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(e). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

!	Here, the parties agree that Dr. Carr is a treating physician and that his opinion is thus entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the Plaintiff's] case record . . . . " 20 C.F.R. § 404.1527(d)(2). Plaintiff, however, contends that the ALJ improperly discounted Dr. Carr's opinions for two reasons.

   1. Plaintiff Contends That Other Record Evidence Supported Dr. Carr's Opinion

   First, Plaintiff alleges that the ALJ erred in discounting Dr. Carr's opinion because other record evidence, including, for instance the opinions from NP Saylor and Dr. Ramirez-Figueroa, supported the limitations opined by Dr. Carr. (Statement of Errors, ECF No. 8, at PAGE ID # 2015, 2017.) As noted, however, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakely*, 581 F.3d at 406 (quoting *Key*, 109 F.3d at 273); *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotations omitted). In this case the ALJ discounted Dr. Carr's opinions because, in part, the record reflected "generally substantially unremarkable physical exam findings," including that Plaintiff was "routinely found to be in no distress or acute distress;" "did not document persistent neurological or musculoskeletal deficits;" Plaintiff's "gait and ability to ambulate have been routinely normal;" Dr. Carr was "not a specialist in neurology or gastroenterology;" and Plaintiff's gastrointestinal issues were "generally under relatively good control" with "conservative treatment." (R. at 1393–94.) The ALJ also discounted Dr. Carr's opinion, in part, because he was not a mental health professional, Plaintiff did not seek professional mental health treatment, and the record reflected "generally normal mental health status functioning." (R. at

1393–94.)  The undersigned concludes that substantial evidence supports these assessments even if Plaintiff points to other evidence that does not.

Dr. Carr's treatment notes support the ALJ's assessments.  In 2009, Dr. Carr referred Plaintiff for testing to investigate his complaints of abdominal pain.  (R. at 876–900.)  An upper GI endoscopy conducted on February 4, 2009, found a single small nodule in the upper third of Plaintiff's esophagus and a small hiatal hernia while a Prometheus test was positive for Chron's disease.  (*Id.*)  Biopsies of the esophageal nodule and of Plaintiff's small bowel and antrum did not demonstrate significant inflammation but revealed the possibility of benign squamous hyperplasia.  (R. at 606–608.)  A June 6, 2009, test ordered by Dr. Carr revealed scattered collections of gas in the small bowel, but no sign of a dilated small or large bowel and no abnormal calcifications of the urinary tract structures.  (R. at 832.)

In March and April of 2012, Dr. Carr's notes indicate that Plaintiff complained about frequent urination.  (R. 824–25.)  An April 4, 2012 CT scan of Plaintiff's abdomen and pelvis ordered by Dr. Carr showed that Plaintiff had renal collecting structure stones but that his large and small bowel appeared unremarkable, he had no signs of colonic diverticulitis or masses, and that his rectum was normal.  (R. at 828.)  In June of 2012, Dr. Carr prescribed Flomax for Plaintiff's frequent urination.  (R. at 824.)  Dr. Carr wrote that although Plaintiff had a kidney stone in late July of that year, Plaintiff reported that he was "doing ok" during an office visit in October of 2012.  (R. at 822.)  On December 5, 2012, Dr. Carr prescribed Flomax after Plaintiff again complained that he was urinating frequently, and on December 19, 2012, Dr. Carr noted that Plaintiff reported that his "BPH is better."  (R. at 820–21.)  In January of 2013, Dr. Carr wrote that Plaintiff also reported that his "Crohn's is doing better."  (R. at 819.)

In July of 2013, Plaintiff sought treatment from Dr. Carr for Chrohn's, headaches, and depression and he reported that his Chrohn's was worsening and that it was not as well controlled with Delzicol. (R. at 817–18.) Dr. Carr prescribed Asacol. (*Id.*) Nevertheless, when Plaintiff returned for a recommended four-month follow-up appointment in November of 2013, he reported experiencing only one Chron's flare up that required prednisone in the past few months. (R. at 815–16.)

On April 28, 2014, Dr. Carr wrote that four weeks prior to that date, he had increased Plaintiff's Zoloft prescription for depression, but that Plaintiff did not report much improvement and "was without interest in any activities that he would normally enjoy." (R. at 811.) Dr. Carr started Plaintiff on Wellbutrin at that time. (R. at 811.) In May of 2014, Dr. Carr wrote that "[w]e added Wellbutrin XI 300mg and [Plaintiff] found that it did improve his interest in activities." (R. at 809.) At that time, Plaintiff rated his pain as a 2 on a scale of 0 to 10. (*Id.*)

At a September 2014, visit, Dr. Carr wrote that Plaintiff reported intermittently experiencing burping sensations followed by upper abdominal pain and that his pain was 5 on a scale of 0 to 10. (R. at 807–08.) Dr. Carr referred Plaintiff to a gastroenterologist for his Chrohn's disease. (*Id.*) In June of 2015, Dr. Carr wrote that Plaintiff was engaging in regular follow-ups with his gastroenterologist but that he visited Dr. Carr for prescription refills. (R. at 1099–1100.) At that visit, Plaintiff indicated that he had experienced two Chrohn's flareups but had no other new problems. (*Id.*)

In January of 2016, Dr. Carr wrote that that Plaintiff "still deals with migraine, GERD, and Crohn disease" but again noted that the addition of Welbutrin "did improve [Plaintiff's] interest in activities" and that Plaintiff answered "no" to both of the following depression screening questions: "In the last two weeks have you been bothered by: Little interest or pleasure

in doing things?  Feeling down depressed or hopeless?"  (R. at 1101–02.)  He also reported that pain in his finger was a 3 on a scale of 0 to 10.  (*Id*.)

In February and May of 2016, Plaintiff sought treatment for pain in his left rib after he injured himself pushing a vehicle and for pain in his low back after he injured himself twisting with a hot tub cover.  (R. at 1103–04, 1105–06, 1107–08.)  He rated his upper side pain as a 5 and his back pain as a 4 on scale of 0 to 10.  (*Id*.)  Dr. Carr administered another depression screen and Plaintiff again denied that he had been recently bothered by "little interest or pleasure in doing things" or "feeling down depressed or hopeless."  (R. at 1105–06.)

On February 14, 2017, Dr. Carr wrote that Plaintiff had recovered well from a recent tractor rollover and that his depression was in partial remission.  (R. at 1705–06.)  Plaintiff rated his rib pain as a 4 on a scale of 0 to 10.  (*Id*.)  Dr. Carr also wrote that Plaintiff wanted "to discuss modifying psych treatment" and that Plaintiff had "[t]ried to go off psych meds and real trouble [sic]."  (*Id*.)  Dr. Carr switched Plaintiff from sertraline to Lexapro but continued him on Wellbutrin.  (R. at 1705–06; 1769–70.)

A February 23, 2017, consultative examination ordered by Dr. Carr indicated that Plaintiff's abdomen was soft, non-tender, and non-distended, and that he had no masses, or bowel sounds.  (R. at 1709–1713.)  The consultant noted that it was "not clear" if Plaintiff had Chrohn's and that further testing was needed.  (*Id*.)  A subsequent May 2, 2017, upper GI endoscopy revealed a normal esophagus and duodenum although there were gastric polyps and a few erosions in the gastric antrum.  (R. at 1714–16.)  A colonoscopy done that same day revealed a small scar in the terminal ileum, and healed ulcers in the sigmoid colon and rectum.  (R. at 1717–19.)  Biopsies of tissues taken during both procedures were generally normal with evidence of "mild inactive (chronic) gastritis."  (R. at 1720–21.)

In May of 2017, Dr. Carr wrote that Plaintiff complained that he had been experiencing almost daily migraines behind his eyes and that cyclobenzaprine had been used as a prophylaxis. (R. at 1771–72.) At a follow up appointment in June of 2017, however, Dr. Carr wrote that Plaintiff had been switched to topiramate and that he reported "[g]reatly improved headaches but had weakness." (R. at 1773–74.) Dr. Carr noted the same improvement in headaches but with weakness at appointments in January and August of 2018. (R. at 1777–78, 1779–80.) At the August 2018 appointment, Dr. Carr also wrote "Chrohn stable." (R. at 1779–80.)

Dr. Carr routinely wrote that Plaintiff appeared to be in no acute distress, and that he was well developed and well nourished. (R. at 815–16, 813–14, 811–12, 809–10, 807–08, 1099–1100, 1101–02, 1103–04, 1105–06, 1107–08, 1769–70, 1771–72, 1773–74, 1777–78, 1779–80.) Dr. Carr also consistently noted that Plaintiff's abdomen was soft, nontender and nondistended. (817–18, 815–16, 813–14, 811–12, 809–10, 807–08, 1099–1100, 1101–02, 1769–70.) Although Plaintiff admitted to having changes in appetite at least once, (R. at 8013–14), he also consistently denied experiencing chills, fatigue, and fever. (R. at 813–14, 1099–1100, 1101–02, 1103–04, 1105–06, 1107–08, 1769–70, 1771–72, 1773–74, 1777–78, 1779–80.) In addition, Plaintiff often indicated that he rated his pain as a "0" on a scale of 1-10. (R. at 1099–1100, 1769–70, 1771–72, 1773–74, 1777–78.) On three occasions, Plaintiff indicated that his pain was a 5, (R. at 1103–04, 807–08, 813–14), but he never assigned his pain a higher score than that. Moreover, Dr. Carr regularly noted that Plaintiff was alert, oriented, goal directed, and somber with good judgment. (R. at 811–12, 809–10, 807–08, 1705–06, 1707–08, 1758–59.)

Other record evidence also supports the ALJ's assessments. For instance, the record reflects that Plaintiff sought emergency room treatment for his abdominal pain in 2008, however, a CT scan of his abdomen and pelvis revealed substantially normal findings with only some wall

thickening. (R. at 555-57.)  In 2009, diagnostic studies confirmed that Plaintiff experienced recurrent esophagitis and mild gastritis, for which he took Carafate and Nexium; Plaintiff reported abdominal pain, which was improved by Asacol; and Plaintiff reported good results controlling his Chrohn's by taking Pentasa.  (R. at 903, 902.)  In 2010, Plaintiff reported that he continued to treat his Chrohn's by taking Mesalamine and Prednisone and that although he had a lengthy history of heartburn and indigestion, he got fairly good relief from Nexium.  (R. at 1015.)  CT scans of Plaintiff's abdomen in February and April of 2010, showed moderate fecal stasis and mild left-sided hydronephrosis, but were otherwise normal.  (R. at 1051, 1191.)  In November of 2010, Plaintiff reported that Imuran seemed to be resolving his issues with Chrohn's disease. (R. at 673.)  In December of 2011, an EGD/colonoscopy and ileocolonoscopy showed no evidence of active Chrohn's disease.  (R. at 993.)  His gait was also steady without assistance at that time. (R. at 1062.)  A CT scan of Plaintiff's abdomen and pelvis in January of 2012, were generally normal except for a suggestion of diffuse wall thickening in the jejunum that was unaccompanied by surrounding inflammatory changes.  (R. at 645.)  Similarly, abdominal images in May of 2012 were normal.  (R. at 734.)  In July of 2012, Plaintiff was "asymptomatic in regards to Chrohn's" and he had one to two bowel movements a day without any bleeding.  (R. at 989.  In June of 2014, Plaintiff ambulated with a normal gait that was "not unsteady, lurching, or unpredictable."  (R. at 799.)  In 2017, Plaintiff's gait was again steady without assistance, he had a full range of motion and muscle strength, and his joints appeared symmetrical.  (R. at 1815.)

In short, substantial record evidence, including Dr. Carr's treatment records, supports the reasons the ALJ gave for discounting Dr. Carr's opinions.  Although Plaintiff points to contrary evidence in the record, this Court must defer to the ALJ's well supported determination even if

there is evidence that might support a contrary conclusion. *Blakley*, 581 F. 3d at 406; *Longworth*, 402 F.3d at 595; *Schmiedebusch v. Comm'r of Soc. Sec.*, 535 F. App'x. 637 649 (6th Cir. 2013) ("The ALJ retains a 'zone of choice' in deciding whether to credit conflicting evidence.")) The undersigned thus finds that the ALJ did not commit reversible error when discounting Dr. Carr's opinion even if other evidence might have supported a contrary conclusion.

> ### 2. The ALJ Did Not Commit Reversible Error When Discounting Dr. Carr's Opinion on the Basis of a Lack of Objective Findings

Plaintiff also contends that the ALJ erred by discounting Dr. Carr's opinion on the basis that there was a lack of objective findings in the record to support that opinion. (Statement of Errors, ECF No. 8, at PAGE ID # 2015.) Plaintiff contends that this error stems from a "fundamental misunderstanding of fibromyalgia" because "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." (Statement of Errors, ECF No. 8, at PAGE ID # 2015–16.) (internal citations and quotations omitted.)

The undersigned concludes that this alleged error is without merit. The Sixth Circuit Court of Appeals has determined that "fibromyalgia is an unusual impairment in that its symptoms are often not supportable by objective medical evidence." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008); *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 243, (6th Cir. 2007) (citing *Preston v. Secretary of Health & Human Services,* 854 F.2d 815, 820 (6th Cir. 1988)). Therefore, an ALJ might arguably err if she discounts a treating physician's opinion about a fibromyalgia patient solely because that opinion is not supported by objective medical evidence. In this case, however, the ALJ did not exclusively rely on a lack of objective findings. Rather, the ALJ also discounted Dr. Carr's opinion because it was

inconsistent with Plaintiff's daily activities. (R. at 1394.) Specifically, when explaining why Dr.

Carr's opinion was only entitled to little weight, the ALJ wrote that Plaintiff "engaged in

significant activities of daily living, including work activity and caring for his children." (*Id.*)

The ALJ also summarized Plaintiff's activities of daily living elsewhere in her

determination. She wrote:

> Specifically, I note that, in April 2014, [Plaintiff] thoroughly completed and signed
> a function report stating that he lived in a house with a family, showered, dressed,
> worked in the family business when able, cleaned, did laundry, used a riding mower
> on his good days, went outside daily, drove, shopped for food and clothing, read,
> assisted with the care of his children, and took care of his pets with the help of
> others . . . . He reported that he did not require reminders to take care of personal
> needs and grooming, or to take his medicine. He reported that he could pay bills,
> count change, handle a savings account, and use a checkbook . . . .

> In May 2014, [Plaintiff] reported that he awoke at 7:00 A.M., retired to bed at 9:00
> P.M., and was up during the night . . . . He reported that he did not nap and that he
> ate small meals throughout the day due to his gastrointestinal problems. He
> reported that he had a driver's license but no hobbies or community activities, and
> that he stayed around the home and left the television on for company. He reported
> that he cleaned laundry and took care of the money management for the home, but
> that his wife prepared meals, cleaned, and grocery shopped. He reported that he no
> longer had friends. He reported that he was currently in business with his father
> renting cabins, but currently worked less than part-time hours.

> At the January 2019 ALJ hearing, [Plaintiff] testified that he lived with his wife and
> two children. He said that he arose around 6:30 A.M., helped his wife with their
> son with Down's syndrome, and helped her homeschool their other son, but was
> too tired and weak to work around the house, go shopping, or otherwise help his
> wife . . . . He said that he cared for his own hygiene. He said that he read to his son
> for 45 minutes to an hour every day.

(R. at 1388–89.)

The undersigned finds this constitutes an accurate summary of record evidence related to

Plaintiff's activities of daily living, including evidence from Plaintiff describing his daily

routines. (R. at 336, 792–93, 65–66.) Plaintiff does not allege that this summary is inaccurate.

Instead, Plaintiff alleges that the ALJ erred because she discounted Dr. Carr's opinion on the

basis that Plaintiff performed work activity even though Plaintiff had not engaged in substantial gainful activity since 2013. (Statement of Errors, ECF No. 8, at PAGE ID # 2018.) That does not, however, accurately describe the ALJ's assessment. The ALJ concluded that Plaintiff's significant activities of living, which included work activity and caring for his children among other things described in the determination, were inconsistent with the extreme exertional, postural, and off-task restrictions opined by Dr. Carr. (R. at 1393–94.) That conclusion was supported by substantial evidence, including evidence from Plaintiff's descriptions of his daily routines. For these reasons, the undersigned finds that this contention of error is without merit.

**B.  The ALJ Did Not Commit Reversible Error When Weighing the Opinion from NP Saylor**

When assessing the medical evidence, the ALJ assigned little weight to NP Saylor's opinion. (R. 1394.) The ALJ first summarized NP Saylor's opinion as follows:

> In July 2013, VA nurse practitioner Laura Saylor opined that [Plaintiff] would have difficulty maintaining physical or sedentary work as frequent exacerbations would interfere with consistent job duties . . . exacerbations of fatigue and general muscle weakness would result in a hard time maintaining gainful employment in a physical or sedentary setting to perform consistent job duties . . . and that he could not work during his exacerbations of headaches.

(*Id.*) The ALJ then analyzed and weighed that opinion. She wrote:

> The question of disability is a matter reserved for the Commissioner (20 CFR § 404.1527(d) and 416.927(d)), and a nurse practitioner's medical opinion is not included among the acceptable sources of medical evidence defined in the regulations (20 CFR 404.1527(f) and 416.927(f)). For that reason, information provided by a nurse practitioner, such as Ms. Saylor, does not equal in probative value reports from those sources shown as being acceptable such as licensed physicians and osteopaths. Additionally, I note that [Plaintiff] was engaging in substantial gainful activity contemporaneous with Ms. Saylor's report, which made no mention of his work activity. Moreover, as summarized above, the longitudinal record and objective exam findings fail to document frequent exacerbations of [Plaintiff's] conditions. Rather, Ms. Saylor appears to have relied significantly on the subjective complaints of [Plaintiff] over the objective record.

As a preliminary matter, Plaintiff's claim was filed on March 25, 2014. The applicable

regulations thus do not define nurse practitioners as an "acceptable medical source[]," but instead

define nurse practitioners as an "other source[]." *Compare* former 20 C.F.R. §§ 404.1513(a) &

416.913(a) *with* former 20 C.F.R. §§ 404.1513(d)(1) & 416.913(d)(1). "While recent revisions

to the regulations now include licensed advanced practice registered nurses among the list of

'acceptable medical sources,' the revisions are expressly not retroactive." *Wooden v. Berryhill*,

1:16-cv-01494, 2017 WL 2644128, at *13 (N.D. Ohio June 1, 2017) (citing, *inter alia*, 20 C.F.R.

§§ 404.1502(a)(7) & 416.902(a)(7) ("Licensed Advanced Practice Registered Nurse, or other

licensed advanced practice nurse with another title, for impairments within his or her licensed

scope of practice" (only with respect to claims filed (see § 416.325) on or after March 27,

2017))), *adopted by* 2017 WL 2634480 (N.D. Ohio June 19, 2017).

Although an ALJ must consider opinions from "other sources" and "generally should

explain the weight given," to their opinions "other-source opinions are not entitled to any special

deference." *Hill v. Comm'r of Soc. Sec.*, 560 Fed.Appx. 547, 550 (6th Cir. 2014) (citation

omitted). In this case, the ALJ expressly considered NP Saylor's opinion. The ALJ also

expressly explained her record-based reasons for assigning that opinion little weight. First, the

ALJ noted that at the time NP Saylor wrote her opinion in July of 2013, Plaintiff was engaged in

substantial gainful activity. (R. at 1386.) Further, the ALJ found NP Saylor's opinion was not

consistent with the longitudinal record and objective examination findings. This was a proper

consideration under the relevant regulations. *See* SSR 06-03P (S.S.A.), 2006 WL 2329939 at

*4–5 (whether other source's opinion is consistent with other evidence is relevant to evaluation

of source's opinion). Finally, the ALJ accurately noted that NP Saylor relied significantly on

Plaintiff's subjective complaints— NP Saylor did not review any medical records, laboratory

tests, imaging studies, or other diagnostic tests.  The basis for an other source's opinion is also a relevant consideration.  *Id.* (explaining that the "degree to which the source presents relevant evidence to support an opinion is relevant to evaluating that opinion).  Accordingly, the ALJ properly considered NP Saylor's opinion and her reasons for assigning it little weight were sufficient.  This assignment of error is without merit.

## VI.    CONCLUSION

In sum, from a review of the record and a whole, the undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Based on the foregoing, it is therefore **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED**.

## VII.   PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this R&R, that party may, within fourteen (14) days, file and serve on all parties objections to the R&R, specifically designating this R&R, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the R&R will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report

and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted).

**IT IS SO ORDERED.**

DATE:  April 13, 2020         *<u>s/ Elizabeth A. Preston Deavers</u>*
                              **ELIZABETH A. PRESTON DEAVERS**
                              **CHIEF UNITED STATES MAGISTRATE JUDGE**